UNTIED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MICHELLE KNOWLES,<br>Personal Representative for the Estate of<br>Maise Knowles, of North Vassalboro,<br>County of Kennebec, State of Maine,<br><br>        Plaintiff,<br><br>v.<br><br>JOSEPH PONTE, Former Commissioner of<br>Maine Department of Corrections, in his<br>individual capacity,<br><br>EDWARD O'CONNOR, Facility<br>Operations Supervisor at Long Creek Youth<br>Detention Center, in his individual capacity,<br><br>GUY W. TINKHAM, Juvenile Program<br>Worker at Long Creek Youth Detention<br>Center, in his individual capacity<br><br>&<br><br>HEATHER E. CHARRON, Juvenile<br>Program Worker at Long Creek Youth<br>Detention Center, in her individual<br>capacity,<br><br>        Defendants. | Civil No. _____ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

    NOW COMES Plaintiff, Michelle Knowles, by and through undersigned counsel, and hereby complains against Defendants Joseph Ponte, Edward O'Connor, Guy Tinkham, and Heather Charron as follows:

**INTRODUCTION**

1. This is a civil rights case about deliberate indifference to the substantial risk of serious injury to Maise Knowles' life while he was a pretrial detainee at the Long Creek Youth Development Center in South Portland. Defendant and former Maine DOC Commissioner Ponte approved and promulgated a Suicide Prevention Policy that did not require the use of suicide-resistant rooms for high-risk pretrial detainees at LCYDC, including Knowles, who would hang himself in a room where he never should have been housed in the first place. Defendants O'Connor, Tinkham, and Charron delayed responding to an obvious emergency situation when Knowles hung himself with his cell with the windows covered by cardboard. Tinkham and Charron knew that Knowles was suicidal and failed to follow the basic instructions of mental health providers about suicide watches to keep Knowles alive. Defendants O'Connor, Tinkham, and Charron were responsible for carrying out Knowles's suicide watches and keeping him alive. Instead they ignored the suicide watch requirements and stood by for nearly fourteen minutes as Knowles was hanging in his cell with the windows covered in cardboard.

## PARTIES

2. Plaintiff Michelle Knowles is the Personal Representative for the Estate of Maise Knowles and Mother of Maise Knowles.
3. Maise Knowles (hereinafter "Knowles") was a juvenile detainee at LCYDC at all times relevant to this Complaint.
4. Knowles was biologically female during his time at LCYDC, but identified sexually as a male and male pronouns will be used throughout this Complaint for Knowles.

5. Long Creek Youth Development Center (hereinafter "LCYDC") is a youth detention facility located in South Portland, Maine that is run and operated by the Maine Department of Corrections (hereinafter "Maine DOC").

6. Former Commissioner Joseph Ponte (hereinafter "Ponte"), sued in his individual capacity, was the Commissioner for the Maine Department of Corrections at the time that the Juvenile Facility Suicide Prevention Procedures affecting Knowles were approved.

7. Facility Operations Supervisor Edward O'Connor (hereinafter "O'Connor"), sued in his individual capacity, was the Facility Operations Supervisor at LCYDC at all times relevant to this Complaint.

8. Juvenile Program Workers Guy Tinkham (hereinafter "Tinkam") and Heather Charron (hereinafter "Charron"), sued in their individual capacities, were juvenile program workers at LCYDC at all times relevant to this Complaint.

## JURISDICTION

9. This action seeks to vindicate rights guaranteed by the Fourteenth Amendment of the United States Constitution, and it is brought pursuant to 42 U.S.C. § 1983.

10. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.  Jurisdiction is also authorized pursuant to 28 U.S.C. § 1343(a)(3).

11. Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this judicial district and because Defendants are subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

12. Knowles was admitted to and detained at LCYDC on August 18, 2016.

13. Maine DOC Suicide Prevention Procedures 10.2 (hereinafter "SPP 10.2") in effect at all times relevant in this Complaint had been approved by Defendant Ponte as Commissioner on January 5, 2012.

14. SPP 10.2 failed to address the use of suicide-resistant, protrusion free rooms for suicidal youth in any way.

15. Correct Care Solutions (hereinafter "CCS"), the correctional healthcare contractor within LCYDC, performed an Admission Health Screening upon Knowles' admission. CCS made an administrative note following its screening that Knowles scored high on all aspects of the Massachusetts Youth Screening Instrument ("MAYSI"), he had a history of cutting, and his most recent suicide attempt was in March.

16. Knowles made his first threat to harm himself on August 31, 2016 saying he would cut himself if he could.

17. Knowles was placed on a suicide watch the same day as a result.

18. LCYDC staff, including Defendants Tinkham and Charron, are responsible for implementation of the suicide watches, which are ordered by qualified mental health providers from CCS and the Maine Department of Health and Human Services (hereinafter "Maine DHHS").

19. Only days later on September 2 Knowles would be able to cut at his arms and inflict self-injury for the first, but not last time, when he was on a suicide watch.

20. Knowles complained to CCS staff that the "close 10" [minute] suicide watches did not work because he did not have a "one on one staff" to talk with during those watches.

21. CCS staff reported Knowles's concerns to LCYDC Juvenile Program Manager Jerry Dixon (hereinafter "JPM Dixon").

22. Knowles would cut at his wrist again on September 7 when he was on a "close 10" [minute] suicide watch.

23. About a month later on October 3, Knowles would engage in his first suicide attempt by attempting unsuccessfully to hang himself from a bedrail with his sheets.

24. Two days later on October 5, and despite being monitored by LCYDC employees on a "constant" constant suicide watch, Knowles would be able to cut his arms and inflict further self-injury.

25. Three days later on October 8 when placed back on "close 10" watches and during a watch that was overseen in part by Defendant Tinkham, Knowles would again be able to cut at his arms and inflict self-injury.

26. Knowles would also report for the first of at least three times that he had the intent or desire to hang himself during his time at LCYDC.

27. On October 11, Knowles complained to Maine DHHS Licensed Clinical Social Worker Al Haynes (hereinafter "LCSW Haynes") that the suicide watches performed by LCYDC staff were too predictable and needed to be more random.

28. On October 12, medical providers for CCS would find 26 new and superficial wounds on the back of Knowles' left hand and inner wrist that he reported were the result of cutting over the past few days during the entirety of which he had been on some form of suicide watch implemented by LCYDC employees.

29. Knowles was moved from a "staggered 15" [minute] watch to a "close 10" and nursing staff cleaned his wounds and wrapped his arm in a Coban bandage.

30. Knowles again complained to LCSW Haynes that suicide watch checks needed to be more random telling him that when he heard his pod door close he knew he had 10 minutes to harm himself or commit suicide.

31. LCSW Haynes reported the concern to JPM Dixon who reportedly discussed the concern with LCYDC officers as he saw them over the course of that week.

32. On October 13, Knowles was moved from a "constant" watch to a "close 10" around 8:30 A.M.

33.  On October 13 around 9:30 A.M. Knowles wrapped the Coban bandages from his self-inflicted wounds on his arms around his neck for his second suicide attempt while he was on a "close 10" suicide watch.

34. The LCYDC officer responsible for the "close 10" suicide watch at and around 9:30 A.M. on October 13 was Defendant Tinkham.

35. On October 15 Knowles reported to CCS staff that he still wished to die and that the constant watch was keeping him safe.

36. On October 19, 25, and 26 updated written Suicide Prevention Protocol (SPP) Plans were provided to LCYDC officers for Knowles and each advised that "In general, make sure that checks are random."

37. Suicide and Self-Injury Watch Logs completed by Defendants Tinkham and Charron both show that each JPW recorded watches in a predictable manner for Knowles.

38. On October 29, Knowles was on a "staggered 15" [minute] suicide watch requiring unpredictable watches.

39. At 10:55 A.M. Knowles left a suicide watch assessment with a CCS employee and returned to his room with a continued "staggered 15" watch order for LCYDC officers in place.

40. Defendants Tinkham and Charron were assigned to the Spruce Unit where Knowles was detained that day.

41. Defendant Charron reportedly was not tall enough to see into the windows of the A-Pod where Knowles was detained and she was supposed to be responsible for B-Pod as a result.

42. Notwithstanding her inability to see through the windows in A-pod, Defendant Charron reported that she conducted a suicide watch observation of Knowles at 11:00 A.M. and that Knowles was laying down at the time.

43. Defendant Tinkham conducted the next "staggered 15" suicide watch observation of Knowles at 11:20 AM and discovered that the windows of Knowles's cell had been covered with cardboard.

44. Defendant Tinkham did not radio Defendant Charron or others to open the door to Knowles's cell.

45. Defendant Tinkham was unable to see Knowles and could not make verbal contact with Knowles.

46. Defendant Tinkham did not open Knowles's cell.

47. Defendant Tinkham did not radio his supervisor Defendant O'Connor.

48. Defendant Tinkham returned to the dayroom of the Spruce Unit to report his findings to Defendant Charron.

49. Defendant Charron called Defendant O'Connor to report what Defendant Tinkham reported to her.

50. Defendant O'Connor did not order Charron or Tinkahm to immediately enter Knowles's cell.

51. At 11:28 A.M. Defendant Charron went to the door of Knowles's cell and attempted to contact Knowles verbally without success.

52. Defendant Charron had Defendant Tinkham unlocked the door to Knowles's cell, but did not open the door.

53. Defendant Charron could see Knowles's feet under the gap of the unlocked, but not fully opened cell door.

54. Defendant Charron did not enter the cell.

55. Defendant Charron called for Defendant Tinkham and both juvenile program workers stood outside Knowles's cell without opening the door before going back to the dayroom area to call Defendant O'Connor again.

56. Defendant O'Connor sent a third LCYDC employee, Juvenile Program Specialist Coleman Findlay (hereinafter "Findlay"), who reported to Knowles's cell, opened the door, and entered the cell to find Knowles hanging from the interior cell door hinge by a ripped pair of boxer shorts.

57. Findlay made an immediate call for medical help at approximately 11:34 AM.

58. The room where Knowles was housed was the farthest room in A-pod from the control desk.

59. The room where Knowles was housed was not a suicide-resistant room free of protrusions.

60. Knowles was cut down, emergency resuscitation efforts were started, and then he was taken by ambulance to Maine Medical Center where he died.

## COUNT I

**Violation of 42 U.S.C. § 1983—Deliberate Indifference to a Serious Risk of Substantial Injury to a Pretrial Detainee in Violation of the Fourteenth Amendment of the United States Constitution**

61. Plaintiff Michelle Knowles reasserts the allegations in Paragraphs 1-60.

62. Defendants Ponte, O'Connor, Tinkham, and Charron, while acting under color of state law, were deliberately indifferent to the mental health needs and general well-being of Knowles.

63. Knowles's rights to medical services, including his mental health services and management of his risk of self-harm, were clearly established federal rights under the 14th Amendment of the U.S. Constitution at the time of his pretrial detention at LCYDC and reasonable persons, including Defendants Ponte, O'Connor, Tinkham, and Charron, knew or should have known about these rights.

64. Defendants Ponte, O'Connor, Tinkham, and Charron were aware of a substantial risk of serious injury to Knowles, namely serious injury and/or death from suicide.

65. Defendants Ponte, O'Connor, Tinkham, and Charron failed to take appropriate steps to protect Knowles from this known danger.

66. Defendant Ponte failed to take appropriate steps to protect Knowles from the previously mentioned known danger when he approved a Suicide Prevention Procedure that failed to address the use of suicide-resistant, protrusion-free rooms in any way, despite the need for such rooms to protect the health and safety of suicidal pretrial detainees being a clearly established right at that time.

67. Defendant O'Connor failed to take appropriate steps to protect Knowles from the previously mentioned known danger when he approved the use of a JPW to conduct watches who was physically incapable of conducting such watches and when he failed to order Tinkham and Charron to immediately open Knowles's cell at a time when he knew Knowles was a high risk for suicide, JPWs Tinkham and Charron could not see or make

9

verbal contact with Knowles, and it was beyond the maximum period of time Knowles was allowed to be left alone under the terms of his suicide watch.

68. Defendant Tinkham failed to take appropriate steps to protect Knowles from the previously mentioned known danger when he failed to carry out the documented suicide watches for Knowles as specifically required and pursuant to his training; when he left Knowles alone in his cell for nearly 25 minutes at a time when he was supposed to check on Knowles in unpredictable periods of time no greater than 15 minutes; when he failed to open Knowles's cell door and/or immediately contact his supervisor at a time when he was a known and documented suicide risk, after he covered his cell door with cardboard, and it was beyond the maximum period of time Knowles was allowed to be left alone under the terms of his suicide watch.

69. Defendant Charron failed to take appropriate steps to protect Knowles from the previously mentioned known danger when she conducted a suicide watch observation for Knowles when she was not able to personally observe Knowles; when she failed to open Knowles's cell door at a time when he was a known and documented suicide risk, after he covered his cell door with cardboard, and it was beyond the maximum period of time Knowles was allowed to be left alone under the terms of his suicide watch.

70. Defendants Ponte, O'Connor, Tinkham and Charron's deliberate indifference to Knowles's mental health needs and well-being deprived Knowles of his constitutional rights.

71. Defendants Ponte, O'Connor, Tinkham and Charron's deliberate indifference were a substantial cause of Knowles's avoidable death.

## COUNT II

**Violation of 42 U.S.C. § 1983—Deliberate Indifference to a Serious Risk of Substantial Injury to a Pretrial Detainee in Violation of the Fourteenth Amendment of the United States Constitution**

72. Plaintiff Michelle Knowles reasserts the allegations in Paragraphs 1-71.

73. Knowles experienced a period of conscious pain and suffering before and during his hanging.

74. Defendant Ponte, O'Connor, Tinkham and Charron's deliberate indifference were a substantial cause of Knowles's conscious pain and suffering.

75. The physical and emotional injuries suffered by Knowles were the result of Defendant Ponte, O'Connor, Tinkham and Charron's recklessness, oppression, and deliberate indifference to his suicidal condition. Knowles is therefore entitled to punitive damages against Defendants Ponte, O'Connor, Tinkham and Charron for the pain and suffering he experienced prior to his death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Michelle Knowles, respectfully prays that this Honorable Court:

76. Enter judgment in Knowles's favor awarding compensatory and punitive damages, plus pre-judgment and post-judgment interest;

77. Award Knowles reimbursement costs of suit, including reasonable attorney fees and other litigation costs incurred in bringing this action pursuant to 42 U.S.C. § 1983;

78. Grant such further relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS IN ITS COMPLAINT SO TRIABLE AS OF RIGHT**.

Dated: April 13, 2021                    /s/ Walter F. McKee
                                         WALTER F. MCKEE, ESQ.
                                         Bar Number: 7848
                                         Attorney for Plaintiff

McKee Law, LLC, P.A.
133 State Street
Augusta, Maine 04330
 (207) 620-8294
*E-mail*: *wmckee@mckeelawmaine.com*


*/s/ Matthew D. Morgan*
MATTHEW D. MORGAN, ESQ.
Bar Number: 5044
Attorney for Plaintiff
McKee Law, LLC, P.A.
133 State Street
Augusta, Maine 04330
 (207) 620-8294
*E-mail*: *mmorgan@mckeelawmaine.com*